COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.  2-06-315-CV

 

 

ROBERTO DIAZ-ROHENA, M.D.                                              APPELLANT

 

                                                   V.

 

CYNTHIA S. MELTON                                                             APPELLEE

 

                                              ------------

 

           FROM THE 236TH
DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                     MEMORANDUM OPINION ON
REMAND[1]

 

                                              ------------








Appellant Roberto Diaz-Rohena, M.D. appeals the
trial court=s denial of his motion to
dismiss with prejudice the health care liability claims of Appellee Cynthia S.
Melton.  We originally dismissed the
appeal for want of jurisdiction.  Diaz-Rohena
v. Melton, 253 S.W.3d 290 (Tex. App.CFort
Worth 2007) (mem. op.), rev=d, 253
S.W.3d 218 (Tex. 2008).  Because the
Texas Supreme Court has instructed us that we do have jurisdiction, we now
consider the appeal on the merits.  Diaz-Rohena,
253 S.W.3d at 218.

In two issues, Dr. Diaz-Rohena argues that we
should review the trial court=s denial
of his motion to dismiss under the de novo standard and that the trial court
abused its discretion by denying his motion to dismiss.  We affirm.

                                            Background

In her original petition, Melton alleges that Dr.
Diaz-Rohena is an ophthalmologist who holds himself out as a specialist in the
treatment and surgical repair of injuries and ailments related to the retina
and vitreous.  When Melton began to
experience difficulty with her vision, her optometrist suspected a macular hole
in her left eye as the cause and referred her to Dr. Diaz-Rohena.   Dr. Diaz-Rohena diagnosed a Stage III
macular hole, concluded that Melton was a good candidate for surgical repair,
and recommended the same to her.  In a
preoperative meeting, Dr. Diaz-Rohena told Melton that her visual acuity
prognosis was Agood.@ 








Dr. Diaz-Rohena performed surgery on Melton.  His surgical notes state repeatedly that he
encountered no complications at any stage of the procedure. But Melton alleges
that his notes suggest problems with her left eye almost immediately following
the procedure and that she suffered a major disruption of her vision within six
weeks.  Dr. Diaz-Rohena=s notes
indicate that her problems may be associated with a gas bubble and pool of
blood near the site of the surgery.  His
responsive plan was to continue to monitor Melton=s
condition in the hope of improvement. 

Melton alleges that her left eye is now
permanently impaired.  She sued Dr.
Diaz-Rohena for medical negligence and gross negligence, alleging various
breaches of the applicable standards of care. 

Melton eventually filed a report prepared by John
M. Maggiano, M.D.  Dr. Maggiano is a
board certified ophthalmologist who practices in California.   After reciting his qualifications, Dr.
Maggiano set out  the applicable
standards of care, as follows:

Surgical treatment of a macular hole includes removal of the vitreous
jelly, identification and removal of a macular membrane, and exchange of the
posterior fluid volume of the vitreous cavity with an air‑gas
mixture.  During this procedure the
surgeon has a duty to control the elements of the surgery to allow the surgery
to safely proceed, without causing damage to the retina, macula or other
structures of the eye.

 

Surgery is appropriately performed by carefully approaching the
macular portion of the retina through the vitreous cavity while holding
instruments in both hands, while viewing and guiding the instrument tips inside
of the vitreous via an operating room microscope and optical viewing system.  The macular membrane is then carefully peeled
from the retinal surface in a non‑traumatic manner.  A disclosing agent such as indocyanine green
(ICG) may be used to make the identification, location and extent of the
membrane easier to visualize, grasp and remove.

 








This duty includes the safe and careful execution of the surgery by
stabilizing the operating room table, preventing movement of the patient[>]s head and eye, and
cautioning operating room personnel not to bump the table, the patient, the
surgeon or the microscope, especially during portions of the procedure in which
the surgeon is in close proximity to the retinal surface.

 

The surgeon=s duty includes
appropriate visualization of the internal structures of the eye through an
operating room microscope and viewing system. 
While viewing the internal anatomy of the eye the surgeon has a duty to
control and guide the instrument tips in a safe and effective manner, without
poking or otherwise damaging the retina or other internal structures.

 

Thus, during the procedure the surgeon has a duty to control all the
elements of the surgery to allow the safe removal of the vitreous and macular
membrane in a non‑traumatic manner. 

 

Dr. Maggiano then explained his opinion as to how Dr. Diaz-Rohena
breached the standards of care:








During the vitrectomy surgery of March 2nd, 2004, Dr. Diaz lost
control of the instrument tips and/or the patient[>]s head position and
poked the retina in two areas close to the area of the macular hole.  This occurred at some point during the period
of time in which he held instruments in his hands with the instrument tips inside
of the eye.  Dr. Diaz breached his duty
by not controlling all the elements of surgery as stated above.  At one or more points during the vitrectomy
surgery Dr. Diaz failed to do one or more of the following: he failed to
correctly stabilize the surgical table or patient[>]s head and body; he
failed to properly instruct and/or sedate the patient sufficiently to prevent
harmful movement of the patient[>]s head or body; he failed to utilize an
anesthesiologist to prevent harmful movement of the patient[>]s head or body; he
failed to correctly control the position and movement of the instrument tips;
he failed to prevent operating room personnel from bumping his hands, arms, or
body; he failed to prevent operating room personnel from bumping the patient[>]s head or body.  Any one of these failures is sufficient
enough to have caused damage to the retina via a poke or gouge to the retina.

 

Next, Dr. Maggiano
described the nature of the injuries Melton sustained:

 

A review of the medical records and a review of the photographs of the
retina of Ms. Melton=s left eye show severe
pathological changes that were not present prior to the vitrectomy surgery of
March 2nd, 2004.  There appear to be at
least two adverse findings in the retina of her left eye. First, she sustained
a new retinal hole (poke or gouge mark) that was not present prior to the
surgery of March 2nd, 2004.  This is
located within a portion of the retina close to, but apart from the original
macular hole.  Second, she sustained a
second poke mark causing a branch retinal artery occlusion (retinal stroke)
close to, but apart from the original macular hole.

 

Each of these injuries alone is a major injury to the retina. Compared
to her pre‑operative status, each injury has caused an additional severe
impairment of visual function.  Both
injuries have jointly caused loss of central visual acuity, and loss of visual
field. Both injuries have jointly prevented the visual recovery expected to
occur after this type of surgery, and have additionally decreased the vision in
Ms. Melton=s left eye to less than
it would have been had the surgery not been performed.  The injuries sustained do not appear to be
treatable by any future medical or surgical interventions.

 

Finally, Dr. Maggiano explained the causal relationship between the
breaches of the standard of care he imputes to Dr. Diaz‑Rohena and the
injuries he just described, as well as his prognosis for the visual acuity of
Melton=s left
eye:








Dr. Diaz breached the standards of care by failing to control the
surgical instrument tips inside of the vitreous cavity during the vitrectomy
procedure. The instrument tips damaged the retina in at least two areas. This
damage includes both a new retina hole, and an occlusion of one of the arterial
branches of the retina. Dr. Diaz=[s] failure to control the circumstances of the
vitrectomy surgery and the moment‑to‑moment position of the
instrument tips within the eye caused the instrument tips to damage (poke or
gouge) the retina in at least two areas. The currently observed retina status,
apart from the pre-operative status, is a result of the damage from the
instrument tips. Thus, the breaches in the standards of care proximately caused
the described injuries.

 

It is more likely than not, absent the breaches of the standards of
care, that Ms. Melton would not have sustained damage to her vision and retina
discovered after the vitrectomy surgery of March 2nd, 2004.

 

The instrument damage to the retina caused the eccentric macular hole
and the branch arterial occlusion. These damages have not only prevented her
from experiencing a visual recovery, but have caused additional visual loss
compared to her pre‑operative status.

 

It is my further opinion that
this kind of injury to the eye is irreversible and will be permanent. In
addition, it is my opinion that Ms. Melton may develop a macular hole in her
right eye in the future, and that she may face the untenable decision of
whether to risk another macular hole surgery. 








Dr. Diaz-Rohena filed objections to Dr. Maggiano=s report
and moved the court to dismiss Melton=s claims,
arguing that Dr. Maggiano=s report provided no factual
basis for his conclusions that Dr. Diaz-Rohena poked the retina in two areas
close to the macular hole, failed to prevent the movement of Melton=s body
or the jostling of the operating table and equipment during the procedure, and
failed to control the movement of the surgical instrument tips inside the
vitreous cavity.  The trial court
overruled Dr. Diaz-Rohena=s objections and denied his
motion to dismiss.  This appeal
followed.  

                                       Standard
of Review

In part of his first issue, Dr. Diaz-Rohena
argues that we should review the trial court=s denial
of his motion to dismiss under the de novo standard.  We recently rejected the identical argument
and held that the abuse of discretion standard applied in Center for
Neurological Disorders, P.A. v. George, No. 02‑06‑00105‑CV,
2008 WL 2717149, at *3 (Tex. App.CFort
Worth July 10, 2008, no pet. h.).  We
therefore overrule this part of Dr. Diaz-Rohena=s first
issue, and we will review the trial court=s ruling
for an abuse of discretion.








To determine whether a trial court abused its
discretion, we must decide whether the trial court acted without reference to
any guiding rules or principles; in other words, we must decide whether the act
was arbitrary or unreasonable.  Downer
v. Aquamarine Operators, Inc., 701 S.W.2d 238, 241B42 (Tex.
1985), cert. denied, 476 U.S. 1159 (1986).  Merely because a trial court may decide a
matter within its discretion in a different manner than an appellate court
would in a similar circumstance does not demonstrate that an abuse of
discretion has occurred.  Id.  But a trial court has no discretion in
determining what the law is or in applying the law to the facts, and thus Aa clear
failure by the trial court to analyze or apply the law correctly will
constitute an abuse of discretion.@  Walker v. Packer, 827
S.W.2d 833, 840 (Tex. 1992); Ehrlich v. Miles, 144 S.W.3d 620, 624 (Tex.
App.CFort
Worth 2004, pet. denied).

                                      Sufficiency
of Report

In the remainder of his first issue and in his
second issue, Dr. Diaz-Rohena argues that the trial court erred by denying his
motion to dismiss because Melton=s expert
report contained legally insufficient information from which the trial court
could conclude that Melton=s claim
has merit.








In a health care liability claim, a claimant must
serve an expert report on each defendant no later than the 120th day after the
claim is filed.  Tex. Civ. Prac. & Rem. Code Ann. ' 74.351(a)
(Vernon Supp. 2008).  Under section
74.351(b), if an expert report has not been served on a defendant physician or
health care provider within the 120-day period, then on the motion of the
affected physician or health care provider, the trial court must dismiss the
claim with prejudice.  Id. ' 74.351(b).  The words Ahas not
been served@ include cases in which a report
has been served but found deficient by the trial court.  Lewis v. Funderburk, 253 S.W.3d 204,
207B08 (Tex.
2008).  Subsection (b) is subject to subsection
(c), which provides that when no report has been served because the report that
was served was found to be inadequate, the trial court has discretion to grant
one thirty-day extension to allow the claimant to cure the deficiency.  Tex.
Civ. Prac. & Rem. Code Ann. ' 74.351(c);
Leland v. Brandal, 217 S.W.3d 60, 64B65 (Tex.
App.CSan
Antonio 2006), aff=d, 257
S.W.3d 204 (Tex. 2008).

A defendant may challenge the adequacy of a
report, and the trial court must grant the motion to dismiss if it finds, after
a hearing, that Athe report does not represent an
objective good faith effort to comply with the definition of an expert report@ in the
statute.  Tex. Civ. Prac. & Rem. Code Ann. ' 74.351(l).  While the expert report Aneed not
marshal all the plaintiff=s proof,@
American Transitional Care Centers of Texas, Inc. v. Palacios, 46
S.W.3d 873, 878 (Tex. 2001) (construing former art. 4590i, ' 13.01),  it must provide a fair summary of the expert=s
opinions as to the Aapplicable standards of care,
the manner in which the care rendered by the physician or health care provider
failed to meet the standards, and the causal relationship between that failure
and the injury, harm, or damages claimed.@  Tex. Civ.
Prac. & Rem. Code Ann. ' 74.351(r)(6).








To constitute a good-faith effort, the report
must Adiscuss
the standard of care, breach, and causation with sufficient specificity to
inform the defendant of the conduct the plaintiff has called into question and
to provide a basis for the trial court to conclude that the claims have merit.@  Palacios, 46 S.W.3d at 875.  A report does not fulfill this requirement if
it merely states the expert=s
conclusions or if it omits any of the statutory requirements.  Id. at 879.  The information in the report Adoes not
have to meet the same requirements as the evidence offered in a summary‑judgment
proceeding or at trial.@ 
Id.  The claimant=s expert
must incorporate enough information to fulfill two purposes: (1) inform the
defendant of the specific conduct the plaintiff has called into question; and
(2) provide a basis for the trial court to conclude the claims are
meritorious.  Id.

When reviewing the adequacy of a report, the only
information relevant to the inquiry is the information contained within the
four corners of the document.  Id. at
878.  This requirement precludes a court
from filling gaps in a report by drawing inferences or guessing as to what the
expert likely meant or intended.  See
id.  However, section 74.351 does not
prohibit experts, as opposed to courts, from making inferences based on
medical history.  Marvin v. Fithian,
No. 14‑07‑00996‑CV, 2008 WL 2579824, at *4 (Tex. App.CHouston
[14th Dist.] Jul. 1, 2008, no pet. h.); see also Tex. R. Evid. 703 (providing that an expert may draw
inferences from the facts or data in a particular case), 705 (providing that
expert may testify in terms of opinions and inferences).








Dr. Diaz-Rohena argues that Dr. Maggiano=s report
is fatally defective because he improperly infers Dr. Diaz-Rohena=s
negligence from the injuries themselves. 
Dr. Diaz-Rohena contends that because nothing in the operative record
suggests that Dr. Diaz-Rohena poked or gouged Melton=s retina
with the surgical instruments, Dr. Maggiano=s report
merely speculates about the cause of her postoperative vision problems.  He further argues that Dr. Maggiano=s report
fails to explain how the alleged pokes or gouges caused Melton=s
subsequent problems, noting that loss of vision is an inherent risk associated
with retinal or vitreous surgery.  See
Tex. Admin. Code Ann. ' 601.2(f)(3)
(Vernon 2008) (setting out inherent risks as defined by the Texas Medical
Disclosure Panel).








Dr. Maggiano stated that a surgeon has a duty to
control the elements involved in retinal surgery to allow the surgery to
proceed safely and without causing damage to the retina, macula, or other eye
structures.  He stated that this duty
includes taking steps to insure that the patient and operating equipment are
immobilized during surgery, especially when the surgeon is working in close
proximity to the retinal surface.  Dr.
Maggiano stated that his review of Melton=s
medical records and retinal photographs showed severe pathological changes to
her left retina that were not present before the procedure performed by Dr.
Diaz-Rohena, namely, two poke or gouge marks close to the original macular
hole.  Acknowledging that Dr. Diaz-Rohena
reported in the operative record that he experienced no complications during
the surgery, Dr. Maggiano nevertheless opines that Dr. Diaz-Rohena failed to control
the surgical instruments during the procedure and poked or gouged Melton=s
retina.  He states that A[e]ach
of these injuries alone is a major injury to the retina@ and
that A[c]ompared
to her preoperative status, each injury caused an additional severe impairment
of visual function.  Both injuries have
jointly caused loss of central visual acuity, and loss of visual field.@ 

Thus, Dr. Maggiano=s report
summarizes his opinions as to the Aapplicable
standards of care, the manner in which the care rendered by the physician or
health care provider failed to meet the standards, and the causal relationship
between that failure and the injury, harm, or damages claimed.@  See Tex.
Civ. Prac. & Rem. Code Ann. ' 74.351(r)(6).  We need not fill gaps in his report by
drawing inferences or guessing as to what he likely meant or intended, see
Palacios, 46 S.W.3d at 878, because his report contains what the statute
requires.








The gist of Dr. Diaz-Rohena=s
argument is that Dr. Maggiano=s report
lacks a Asmoking-gun@
admission by Dr. Diaz-Rohena in the operative record that he gouged or poked
Melton=s retina
during the procedure.  But the rules of
evidence allow an expert to draw inferences from the underlying facts or data,
and that is what Dr. Maggiano has done here. 
See Tex. R. Evid. 703,
705.  Moreover, Dr. Maggiano=s report
does not merely state his opinions and inferences; he explains the basis for
his conclusions and links them to the facts. 
See Bowie Mem=l Hosp.
v. Wright, 79 S.W.3d 48, 52 (Tex. 2002).

Dr. Diaz-Rohena likens this case to Jernigan
v. Langley, in which the supreme court criticized the court of appeals for
indulging in Amultiple inferences that are
simply unsupported by the scant reports.@  195 S.W.3d 91, 94 (Tex. 2006).  This case is easily distinguishable.  In Jernigan, one of the plaintiff=s two
expert reports did not mention Dr. Jernigan at all, and the other mentioned him
only in passing in a single sentence.  Id.
at 93.  By contrast, Dr. Maggiano=s entire
report focuses solely on Dr. Diaz-Rohena. 
Moreover, in Jernigan, it was the court of appeals that made
(unsupported) inferences.  Id. at
94.  In this case, it is the expert, Dr.
MaggianoCnot the
courtCwho
draws inferences from the underlying medical records in light of the applicable
standards of care, and his report explains the link between the records and his
inferences. 








Dr. Diaz-Rohena also suggests that Dr. Maggiano=s report
impermissibly relies on the evidentiary rule of res ipsa loquitur to support
his inferences.  Res ipsa loquitur is a
doctrine that permits the fact‑finder to infer negligence in the absence
of direct proof.  Jones v. Tarrant
Util. Co., 638 S.W.2d 862, 865 (Tex. 1982). 
It is generally inapplicable to medical malpractice cases except those
in which the nature of the alleged malpractice is plainly within the common
knowledge of laymen, making expert testimony unnecessary.  Shelton v. Sargent, 144 S.W.3d 113, 120
(Tex. App.CFort Worth 2004, pet. denied)
(citing Haddock v. Arnspiger, 793 S.W.2d 948, 951 (Tex. 1990)).  Thus res ipsa loquitur, which dispenses with
the need for expert testimony, is not implicated in this case because Melton is
relying on an expertCDr. MaggianoCto
establish the elements required by section 74.351.

We hold that Dr. Maggiano=s report
(1) informed Dr. Diaz-Rohena of the specific conduct that Melton has called
into question and (2) provided a basis for the trial court to conclude the
claims are meritorious.  See Palacios,
46 S.W.3d at 879.  We therefore hold
that the trial court did not abuse its discretion by determining that the
report complied with section 74.351, overruling Dr. Diaz-Rohena=s
objections to the report, and denying his motion to dismiss.  We overrule both of Dr. Diaz-Rohena=s
issues.

                                             Conclusion

Having overruled both of Dr. Diaz-Rohena=s
issues, we affirm the trial court=s order
overruling his objections and denying his motion to dismiss.

 

 

 

ANNE
GARDNER

JUSTICE

 

PANEL:      HOLMAN,
GARDNER, and WALKER, JJ.

 

DELIVERED:  August 29, 2008











[1]See Tex.
R. App. P. 47.4.